COURT OF APPEALS OF VIRGINIA


Present: Judges Clements, Haley and Senior Judge Overton
Argued at Richmond, Virginia


STANLEY KELSEY HAYDEN

MEMORANDUM OPINION[*] BY
v.          Record No. 1042-05-2          JUDGE JEAN HARRISON CLEMENTS
JUNE 27, 2006

COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF CHESTERFIELD COUNTY
Herbert C. Gill, Jr., Judge

John A. March, Jr., for appellant.

Deana A. Malek, Assistant Attorney General (Robert F.
McDonnell, Attorney General, on brief), for appellee.


Stanley Kelsey Hayden (appellant) was convicted in a jury trial of forcible sodomy in

violation of Code § 18.2-67.1, abduction in violation of Code § 18.2-47, robbery in violation of

Code § 18.2-58, and conspiracy to commit robbery in violation of Code § 18.2-22. On appeal, he

contends the trial court erred in (1) denying his motion to dismiss the indictments and (2) finding

the evidence sufficient to prove he was the criminal agent. For the reasons that follow, we affirm

the trial court's judgment and appellant's convictions.

As the parties are fully conversant with the record in this case, and because this

memorandum opinion carries no precedential value, this opinion recites only those facts and

incidents of the proceedings as are necessary to the parties' understanding of the disposition of this

appeal.

---

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

## I. BACKGROUND

On March 6, 2000, Amanda Jones was in bed with her boyfriend Tommy Dowdy at his mobile home in Chesterfield County. At some point that night, someone in the hall opened and closed Dowdy's bedroom door. Dowdy got dressed and went out into the hall. A commotion ensued, and Jones heard someone whose voice she did not recognize say, "[G]ive me the money."

An African-American man then entered the unlit bedroom, placed a gun against Jones's temple, and instructed her to put her face in the pillow and not look at him. The man took three rings from Jones's fingers and rummaged around the room. Returning to Jones's bedside, the man put the gun to her head and forced her to perform fellatio on him. Upon ejaculation, some of the man's semen got in Jones's hair. Immediately afterward, the man and his accomplice, who had been holding a gun on Dowdy, left the mobile home. According to Jones, the intruders spoke with a Jamaican accent.

When the lights were turned on, Jones saw that Dowdy's face had been "gruesome[ly]" beaten and the front door had been kicked in. Two cell phones, two pagers, a video game console, and an uncashed paycheck had been taken from the mobile home. One of the cell phones belonged to Jones. Dowdy called 911, and Detective William Norris of the Chesterfield Police Department responded to the scene and began an investigation.

Jones was transported to an area hospital, where a forensic nurse examined her and collected evidence using a physical evidence recovery kit (PERK). Seminal fluid was recovered from Jones's mouth and hair. Upon completion of the examination, the PERK was turned over to Detective Norris. He took it to the police department's forensics section, which transported it to the State Crime Laboratory for analysis.

Continuing his investigation, Detective Norris obtained the phone records for Jones's cell phone. Investigating the calls that were made on the phone after it was stolen, Detective Norris spoke with appellant on March 10, 2000. Appellant, who is African-American, admitted using the phone to make a call shortly after it was stolen. He claimed, however, that he had borrowed the phone from a man named "Smoke" and a woman named Brenda Ellis. Appellant refused to give Detective Norris a hair sample for DNA testing at the time.

In May 2000, Bradford C. Jenkins, a forensic scientist with the State Crime Laboratory, performed a DNA analysis of the PERK samples. After isolating DNA from the seminal fluid recovered from Jones's mouth and hair, Jenkins developed DNA profiles for each of those samples. A single DNA profile was developed from the hair sample and a mixture of at least two profiles was developed from the oral sample. Comparing those profiles to DNA profiles developed from blood samples taken from Jones and Dowdy, Jenkins determined that there were DNA profiles in the hair and mouth samples "that were foreign to" Jones and Dowdy. Further comparisons, however, could not be performed at that time as no suspect had been developed. Jenkins recorded his findings in a Certificate of Analysis dated May 31, 2000. The PERK was then returned to the police department's property section for storage.

As part of its periodic inventory of stored items, the police department's property section sent Detective Norris an unclaimed property release form on January 4, 2001, asking him if the PERK could be released for destruction. Knowing that PERK evidence needed to be kept until the case was fully resolved, Detective Norris indicated on the form that the property section should continue to "hold" the PERK. On January 5, 2002, the property section again sent Detective Norris an unclaimed property release form wanting to know if the PERK could be released for destruction. This time, Detective Norris indicated on the form that the PERK could be released for destruction. Admitting at trial that he "should have held the evidence" because

- 3 -

the case had not been resolved, Detective Norris explained that, in going through a stack of "20 to 30" unclaimed property release forms, he "either inadvertently checked the wrong box" or, seeing that the offense was described on the form solely as a "robbery" and knowing he "didn't have any active robbery cases anymore" since he had been transferred out of the criminal investigations section of the police department, he inadvertently thought the PERK could be released for destruction. The unclaimed property release form did not include any names related to the case, but merely set forth the case number and the offense description of robbery. The PERK was destroyed on April 18, 2002.

On August 21, 2003, a grand jury indicted appellant in connection with the events of March 6, 2000. On September 16, 2003, a forensic technician obtained a buccal swab from appellant. The swab was then transported to the State Crime Laboratory, where Jenkins analyzed it.

After developing appellant's DNA profile from the buccal swab, Jenkins compared the results with the DNA profiles developed in May 2000 from the PERK hair and mouth samples taken from Jones. Jenkins determined that the DNA profile developed from the hair sample was "consistent with the DNA profile of [appellant]." Thus, Jenkins concluded, appellant could "not be eliminated as a possible contributor of the genetic material detected from the [hair] sample." According to Jenkins, the probability of randomly selecting an unrelated individual in the Black population with the same DNA profile was one in 220 million.[1] Jenkins also determined that appellant, as well as Jones, could not be eliminated as a possible co-contributor of the genetic material detected in the seminal fluid recovered from Jones's mouth, although the comparative

---

[1] Jenkins further noted that the probability of randomly selecting an unrelated person with a matching DNA profile was one in 1.3 billion in the Caucasian population and one in 1.1 billion in the Hispanic population.

analysis of that sample yielded less certainty. Jenkins recorded his results and conclusions in a Certificate of Analysis dated January 7, 2004.

On September 22, 2004, the trial court conducted a pretrial hearing on appellant's "motion to dismiss the indictments."[2] Appellant argued that the charges against him should be dismissed because the police destroyed the PERK samples prior to trial, thereby preventing him from using advanced DNA technology to retest the samples from Jones's hair and mouth and possibly produce exculpatory evidence. The trial court denied the motion to dismiss, and a jury trial commenced on January 5, 2005. Appellant renewed his motion to dismiss the indictments at trial.

Testifying for the Commonwealth as an expert in the field of forensic biology, Jenkins admitted that there had been advances in DNA analysis since his testing of the PERK samples in May 2000. He explained that, had the PERK samples not been destroyed, more recent testing technology would have allowed a more thorough comparison of DNA profiles using as many as sixteen genetic loci, rather than the eight loci he compared in 2000. Jenkins nevertheless insisted that, in light of the rarity of the DNA profile developed from the sample recovered from Jones's hair, there was no "reasonable possibility" that any amount of additional testing using more recent technology would change the results he had reached in the earlier testing with respect to that sample.

Doctor Kevin McElfresh, a population geneticist and expert witness for the Commonwealth, agreed that, although the DNA profiling technique utilized by Jenkins was the scientific standard in 2000, there had been subsequent advances in the technology. He likewise testified that, where, as here, "you have a probability of one in 220 million of drawing that

---

[2] No written motion relating to this hearing appears in the record. For purposes of this appeal, we adopt the titular description of the motion used by appellant in his first "Question Presented" and throughout his appellate brief.

particular DNA type at random," the possibility that evaluating more genetic loci within a sample might eliminate the contributor is "miniscule" and "not practically reasonable." He therefore concluded that it was not a reasonable possibility that more recent testing technology would eliminate appellant as a contributor of the genetic material in the seminal fluid recovered from Jones's hair.

Appellant's DNA expert, Dr. J. Thomas McClintock, reviewed the DNA results and testified that the probability of randomly selecting an unrelated individual from the Black population with a DNA profile matching that developed from the sample of seminal fluid from Jones's mouth was only "one in approximately 48 thousand." He stated that there was a "possibility" that additional testing of the sample from Jones's mouth could have either excluded or further incriminated appellant. He nevertheless agreed that the probability of appellant being excluded with further testing of the hair sample was one in 219,999,999 and conceded that appellant would not "be excluded with those numbers."

Appellant, who had a felony conviction in January 2003 for possession of cocaine, testified in his own defense. He denied having committed the acts on which the charges were based. He further denied being Jamaican or ever having been to Jamaica, although he admitted on cross-examination that he had heard a Jamaican accent before.

The trial court again denied appellant's motion to dismiss the indictments, and the jury convicted appellant of forcible sodomy, abduction, robbery, and conspiracy to commit robbery. On May 9, 2005, the trial court sentenced appellant, in accordance with the jury's verdict, to a total of forty-one years' incarceration. This appeal followed.

## II. MOTION TO DISMISS THE INDICTMENTS

Appellant contends the trial court erred in denying his motion to dismiss the indictments because "the Commonwealth destroyed DNA evidence prior to trial" that may have shown upon

further testing that he was not the criminal agent. Asserting "by analogy that the case law governing DUI blood tests and samples should also govern in the areas of DNA samples," appellant argues that the destruction of the PERK samples prior to trial requires dismissal of the charges against him pursuant to Shoemaker v. Commonwealth, 18 Va. App. 61, 441 S.E.2d 354 (1994). Alternatively, appellant argues that, because the destruction of the PERK samples rendered the samples unavailable for independent testing using modern DNA technology and, thus, denied him "the possibility that further testing may have resulted in exculpatory evidence," the charges against him should be dismissed on due process grounds. Both of appellant's arguments are meritless.

First, appellant's reliance on Shoemaker is misplaced. In Shoemaker, the defendant was charged with driving under the influence (DUI) and consented to taking a blood test. Id. at 62, 441 S.E.2d at 355. Two vials of his blood were drawn. One was sent to the state laboratory for testing; the other was sent for independent testing to a laboratory selected by the defendant from a list of approved laboratories provided by the arresting officer. Unbeknownst to the officer, however, the laboratory selected by the defendant no longer performed that service and returned the vial with the notation "Refused." The Commonwealth made no efforts to seek independent testing from another laboratory. Based on the Commonwealth's failure to obtain the independent testing requested by the defendant, the trial court refused to admit into evidence the results of the analysis by the state laboratory. The court, however, denied the defendant's motion to dismiss the charge and convicted the defendant on the testimonial evidence offered by the officer. Id. at 62-63, 441 S.E.2d at 355.

We reversed the defendant's conviction and dismissed the charge against him, reasoning as follows:

> In this case, [the officer] gave [the defendant] an
> out-of-date list of laboratories that included laboratories that were

- 7 -

no longer approved by the Division of Forensic Science. . . . The evidence established that the [laboratory selected by the defendant] returned the container to the court, unopened and untested, with the notation: "Refused." The Commonwealth took no further action to have the sample tested. . . . Such conduct on the part of the Commonwealth effectively foreclosed any possibility that [the defendant] would receive the independent laboratory analysis to which he was entitled. From the record before us, we conclude that the Commonwealth failed to prove that it substantially complied with the requirements of Code § 18.2-268.6.[3]

The trial court attempted to fashion a remedy for the Commonwealth's failure in this regard by refusing to admit the Commonwealth's test results, and proceeded to try the case based only on the arresting officer's testimony. This remedy is inadequate, however, because the independent test results could have been exculpatory.

The Supreme Court has explained the importance of diligent adherence to the statutory scheme: ". . . . It protects one who has the odor of alcohol on his breath but has not been drinking to excess, and one whose conduct may create the appearance of intoxication when he is suffering from some physical condition over which he has no control." Walton v. City of Roanoke, 204 Va. 678, 683, 133 S.E.2d 315, 319 (1963). Accordingly, "when the Commonwealth cannot prove that it substantially complied with [Code § 18.2-268.6], the Commonwealth is foreclosed from prosecution." Kemp, [16] Va. App. at [366], 429 S.E.2d at 879.

Id. at 64-65, 441 S.E.2d at 356 (footnote added) (citations omitted).

---

[3] The version of Code § 18.2-268.6 in effect when Shoemaker was decided required "the Commonwealth to take two blood samples and allow the accused to obtain his separate blood analysis, so that the results [could] be compared with the results of the Commonwealth and so that any discrepancies can be considered by the trier of fact." Kemp v. Commonwealth, 16 Va. App. 360, 364, 429 S.E.2d 875, 878 (1993). Code § 18.2-268.7 now serves a similar purpose:

After completion of the analysis, the Department shall preserve the remainder of the blood until 90 days have lapsed from the date the blood was drawn. During this 90-day period, the accused may, by motion filed before the court in which the charge will be heard, with notice to the Department, request an order directing the Department to transmit the remainder of the blood sample to an independent laboratory retained by the accused for analysis. The Department shall destroy the remainder of the blood sample if no notice of a motion to transmit the remaining blood sample is received during the 90-day period.

- 8 -

It is clear, therefore, that we dismissed the charge against the defendant in <u>Shoemaker</u> because the Commonwealth failed to substantially comply with the salutary statute expressly requiring the Commonwealth to allow a person accused of DUI to obtain an independent laboratory analysis of his blood. Adherence to the statute was mandatory.

However, no such statute applies, by analogy or otherwise, in this case. Plainly, an accused's statutory right to an independent analysis of his blood under the former version of Code § 18.2-268.6 or the current version of Code § 18.2-268.7 is peculiar to DUI cases. <u>See</u> <u>Stevens v. Commonwealth</u>, 44 Va. App. 122, 130, 603 S.E.2d 642, 646 (2004) ("Code of Virginia, Title 18.2, Chapter 7, Article 2 governs the prosecution of driving a motor vehicle while intoxicated, and includes . . . Code §§ 18.2-268.1 through 18.2-268.11, which provide the steps for conducting breath and blood tests as related to the implied consent law."), <u>aff'd</u> <u>en banc</u>, 46 Va. App. 234, 616 S.E.2d 754 (2005). "'Courts cannot read into a statute something that is not within the manifest intention of the legislature as gathered from the statute itself.'" <u>Commonwealth v. Chatman</u>, 260 Va. 562, 571, 538 S.E.2d 304, 308 (2000) (quoting <u>Jordan v.</u> <u>Town of South Boston</u>, 138 Va. 838, 844, 122 S.E. 265, 267 (1924)). Furthermore, no Virginia statute specifically entitles a criminal defendant to an independent DNA analysis of evidence obtained by the Commonwealth. Accordingly, we reject appellant's claim that the destruction of the PERK samples prior to trial requires dismissal of the indictments under <u>Shoemaker</u>.

Second, appellant's claim that the Commonwealth's destruction of the PERK samples prior to trial violated his due process rights is unsupported by the record. "On appeal, the burden is on appellant to show that the trial court erred." <u>Galbraith v. Commonwealth</u>, 18 Va. App. 734, 739, 446 S.E.2d 633, 637 (1994). "Unless appellant can show bad faith on the part of the [police], or that the missing evidence would be exculpatory, failure to preserve potentially relevant evidence

does not constitute a denial of due process." Id. at 739, 446 S.E.2d at 636 (citing Arizona v. Youngblood, 488 U.S. 51, 58 (1988)).

In this case, appellant makes no allegation of bad faith on appeal. Moreover, the record contains no evidence of bad faith on the part of the police. Indeed, the undisputed evidence at trial demonstrated that Detective Norris inadvertently permitted the destruction of the PERK by mistakenly checking the wrong box on an unclaimed property release form. There was no evidence that there was any intent or conscious effort on his part to destroy exculpatory evidence. At worst, Detective Norris's actions constituted negligence, which does not amount, by itself, to a due process violation. Youngblood, 488 U.S. at 58.

Likewise, appellant fails to show that the destroyed evidence would have been exculpatory. In asserting his due process claim, appellant relies on his expert's testimony that there was a "possibility" that further DNA testing of the seminal fluid recovered from Jones's mouth may have resulted in exculpatory evidence. Based on that evidence, however, appellant "can assert no more than the mere possibility that further testing could have exculpated him," which is not enough to establish a due process violation. Lovitt v. Warden, 266 Va. 216, 242, 585 S.E.2d 801, 816 (2003) (citing Youngblood, 488 U.S. at 58 n.*). Moreover, appellant's own expert testified that additional testing of the seminal fluid recovered from Jones's mouth could have further incriminated appellant and agreed with the Commonwealth's experts that further testing would not exclude appellant as a contributor of the genetic material in the seminal fluid recovered from Jones's hair.

Because the record does not show any bad faith on the part of the police or that further testing of the PERK samples would have been exculpatory, we cannot say the police's failure to preserve the PERK constituted a denial of due process.

Consequently, we hold the trial court did not err in denying appellant's motion to dismiss the indictments.

### III.  SUFFICIENCY OF THE EVIDENCE

Appellant contends the Commonwealth's evidence was insufficient to prove he was the criminal agent who committed the charged crimes.  In support of that contention, appellant argues exclusively as follows:

> Jones testified that her assailant spoke with a Jamaican accent[,] and [appellant's testimony demonstrated he] did not speak with such an accent.  Moreover, Jones did not get a look at her attacker to be able to identify him in court.  Therefore, the victim did not identify [appellant] as the attacker.  The Commonwealth relied on DNA evidence to identify [appellant] as the assailant.  However, as mentioned earlier, the DNA samples taken at the crime scene were destroyed before [appellant] had an opportunity to independently test the samples.  Expert testimony indicated that such testing may result in exculpatory evidence for [appellant], by eliminating him as a potential contributor to the DNA samples that were recovered.
>
> Because there was no identification by the victim and the DNA evidence was tainted[,] the evidence was insufficient to prove beyond a reasonable doubt that [appellant] was the person responsible for the attack on Jones.  Consequently, the convictions must be reversed.

It is clear from appellant's argument that his sufficiency of the evidence claim is based largely on the same reasoning he relied on in his prior challenge to the Commonwealth's DNA evidence on due process grounds.  Having previously rejected that reasoning as meritless, we need not readdress it here.

> "When considering the sufficiency of the evidence on appeal of a criminal conviction, we must view all the evidence in the light most favorable to the Commonwealth and accord to the evidence all reasonable inferences fairly deducible therefrom.  The jury's verdict will not be disturbed on appeal unless it is plainly wrong or without evidence to support it."

Clark v. Commonwealth, 30 Va. App. 406, 409-10, 517 S.E.2d 260, 261 (1999) (quoting

Traverso v. Commonwealth, 6 Va. App. 172, 176, 366 S.E.2d 719, 721 (1988) (citations

omitted)). "'The credibility of the witnesses and the weight accorded the evidence are matters solely for the fact finder who has the opportunity to see and hear that evidence as it is presented.'" Donati v. Commonwealth, 37 Va. App. 575, 578-79, 560 S.E.2d 455, 456 (2002) (quoting Sandoval v. Commonwealth, 20 Va. App. 133, 138, 455 S.E.2d 730, 732 (1995)).

Here, the evidence presented at trial established that the intruders stole Jones's cell phone on the night of the attack and that appellant used it to make a call shortly after it was stolen. Moreover, the Commonwealth's undisputed DNA evidence established that the DNA profile developed from the seminal fluid recovered from Jones's hair matched appellant's DNA profile and that the probability of randomly selecting an unrelated individual in the Black population with the same DNA profile was one in 220 million.

In light of this evidence, we cannot say the jury's verdict was plainly wrong or without evidence to support it. Moreover, the jury was entitled to reject appellant's testimony denying any involvement in the crimes and weigh the evidence presented concerning the intruders' accents in determining appellant's guilt. See Price v. Commonwealth, 18 Va. App. 760, 768, 446 S.E.2d 642, 647 (1994) ("[A] jury [is] entitled to disbelieve [an] appellant's self-serving testimony and to conclude that he was lying to conceal his guilt.").

We conclude, therefore, that the evidence was sufficient, as a matter of law, to prove beyond a reasonable doubt that appellant was the criminal agent.

## IV.  CONCLUSION

For these reasons, we affirm the judgment of the trial court and appellant's convictions.

Affirmed.